# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
### WESTERN DIVISION

ALLOYS INTERNATIONAL, INC.,          Case No. 1:10-cv-293

       Plaintiff,                     Judge Timothy S. Black

vs.

AERONCA, INC.,

       Defendant.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

This civil case is before the Court following a trial to the bench on June 18-20,

2011. Following trial, the parties filed Trial Briefs with proposed Findings of Fact and

Conclusions of Law (Docs. 76, 78, and 79). Pursuant to Fed. R. Civ. P. 52, the Court

now sets forth and enters its Findings of Fact and Conclusions of Law.

## I. FINDINGS OF FACT

1. Plaintiff Alloys International, Inc. is a New York corporation in the business of

marketing and selling specialty metals.

2. Defendant Aeronca, Inc. is an Ohio corporation in the business of

manufacturing airframe structures and jet engine components for the commercial and

defense aircraft industry.

3. On August 3, 2004, Alloys and Aeronca entered into a contract for the sale of

3600 pounds of specialty metal. The contract was for goods to be ultimately used in the

course of manufacturing Airbus aircraft. The contract was not made pursuant to, or in furtherance of, any contract issued by the government of the United States or any state.

4. The contract was memorialized in writing as "Purchase Order No. 729649" and associated Terms and Conditions. The Terms and Conditions were drafted entirely by Aeronca, without any input from Alloys.

5. The relevant portions of the Terms and Conditions stated as follows:

> 2. COMPLETE AGREEMENT. This Purchase Order is a complete and exclusive statement of the terms of the agreement between the parties hereto. If any additional "Supplemental Provisions" (if a part hereof) shall be inconsistent with any of these printed "General Terms and Conditions," the "Supplemental Provisions shall govern. If any typewritten or rubberstamped provision of this Order is inconsistent with any printed provisions, the typewritten version or rubberstamped provision shall govern. No agreement or understanding varying or adding to the terms or conditions hereof shall be binding upon the Buyer, unless made in writing and signed by its duly authorized representative. All covenants and warranties hereunder shall also be constructed as conditions.

. . .

> 6. CHANGES.
> a) Buyer may, at any time, by written notice or Order:
> 1) Make changes in the shipping and packing instructions
> 2) Increase or decrease the quantity of work or services ordered;
> 3) Change the drawing, designs, statement of work or specifications;
> 4) Change the place of inspection, delivery, or acceptance;
> 5) Change the amount of Government or Buyer furnished property;
> 6) Change work or service schedules.
> b) If any change causes a variation in the cost of performance or the time required for performance, an equitable adjustment shall be made in this Purchase Order price and/or delivery schedule and this

Purchase Order shall be modified in writing accordingly.  Any claim for adjustment under this clause must be asserted in writing within twenty-one (21) days from the date the change is ordered.  However, if Buyer decides the facts justify such action, it may receive and act upon any such claim asserted at any time prior to final payment under this Purchase Order.  Pending such adjustment, Seller shall proceed in accordance with such Change Notice or Order.  Failure to agree to any adjustment shall be a dispute constitution a question of fact within the meaning of the clause of this Contract entitled "Disputes."

. . .

12.    TERMINATION.

a)    Buyer may terminate this order in whole or in part in accordance with the provisions of the DEFAULT clause set forth in DAR 7-103.11 and/or FAR 52.248-8 if Seller fails to comply with any of the provisions hereof, or if Seller becomes the subject of a proceeding under state or federal law for relief of debtors or makes an assignment for the benefit of creditors.

b)    Without affecting its right to terminate this order under paragraph (a) hereof, Buyer may, for its convenience, terminate this order in whole or, from time to time, in part, in accordance with the provisions of the "TERMINATION" clause set forth in DAR 8-706 and/or FAR – 19.502(e)(1).

c)    The DAR clauses referred to in paragraphs (a) and (b) are hereby incorporated herein by reference as in effect on the date hereof, with the following changes: the words "Government" and "Contracting Officer" shall mean Buyer, the word "Contract" shall mean this order, and the word "Contractor" shall mean Seller; and further, the provisions in paragraph (c) of DAR7-103.11 and/or FAR 52.249-8 shall be deemed deleted.

6.  Aeronca did not receive any written objection by Alloys to the Terms and

Conditions within ten days of their receipt.

7.  Alloys and Aeronca mutually agreed to multiple changes to the delivery dates of material purchased pursuant to Purchase Order No. 729649, as reflected in Revisions 001 through 008.  Aeronca sent each revision to Alloys, accompanied by a copy of the Terms and Conditions.

8.  Although the parties agreed to a number of revisions, the total net quantity ordered by Aeronca remained constant at 3600 pounds.  At no time during the course of Revisions 001 through 008 did the parties agree to a permanent net reduction in quantities of materials ordered pursuant to Purchase Order No. 729649.

9.  As of February 27, 2008, the terms of the Contract were memorialized as "Revision 008" to Purchase Order 729649.  Revision 008 required Aeronca to accept future delivery of, and make payment for, the following amounts of specialty metal at the price of $374.80 per pound of material:[1]

| Rev 008 Shipment Number | Amount of Material | Delivery Date of Material |
|---|---|---|
| 34 | 350 lbs. | 1/25/2009 |
| 35 | 325 lbs. | 6/29/2009 |
| 36 | 325 lbs. | 8/17/2009 |
| 37 | 325 lbs. | 10/5/2009 |
| 38 | 325 lbs. | 11/16/2009 |

---

[1] Aeronca purchased 2150 pounds of the 3800 pounds of specialty metal called for in Purchase Order No. 729649 in shipments 1-33.  There is no dispute regarding those earlier shipments.

10. On July 18, 2008, Aeronca rejected a prior shipment of 305.51 pounds of coil from Alloys due to a discoloration problem. Alloys accepted the rejection of the shipment and agreed to correct the discoloration problem.

11. On November 17, 2008, Aeronca's Senior Buyer, Rebecca Noble, informed Alloys Sales Manager Lee Glasford that Aeronca wished to reduce the quantities of goods ordered under Purchase Order No. 729649.

12. Glasford replied that such a change would not be acceptable to Alloys. On November 20, 2008, Alloys CFO Marvin Rubman informed Aeronca that Alloys had already produced the goods called for in shipments 33 and 34 and thus could not accept a delay in those deliveries. Rubman's letter stated that "once the above issue has been resolved, we can work on a reschedule for the balance of the material required."

13. On or about December 8, 2008, Aeronca issued Revision 009 to Purchase Order No. 729649, accompanied by its Terms and Conditions.

14. Revision 009 had not been mutually agreed upon by the parties.

15. Under Revision 009, Aeronca revised its shipping dates and quantities as follows:

| Rev 008 Line Number | Amount of Material | Delivery Date of Material |
| --- | --- | --- |
| 34 | 100 lbs. | 3/1/2009 |
| 35 | 100 lbs. | 4/1/2009 |
| 36 | 100 lbs. | 5/3/2010 |
| 37 | 150 lbs. | 7/1/2010 |
| 38 | 100 lbs. | 8/2/2010 |

| 39 | 100 lbs. | 9/1/2010 |
|----|----------|----------|
| 40 | 100 lbs. | 10/1/2010 |
| 41 | 100 lbs. | 11/1/2010 |

16.  Revision 009, along with associated communications between the parties at that time and after, indicated that Aeronca would not accept delivery and make payment of material as specified by Revision 008.  Revision 009 reduced the total quantity remaining on Purchase Order No. 729649 from 1650 pounds to 850 pounds.

17.  After the issuance of Aeronca's Revision 009, the parties agreed to a transaction in early 2009 in which Aeronca purchased accepted shipments 33 and 34. Shipment 34 consisted of  350 pounds of the material at a contract price of $374.80 per pound.

18. On or about February 6, 2009, Aeronca unilaterally issued  "Revision 010" to Purchase Order No. 729649.

19.  Revision 010 reflected the recent payment and delivery of 350 pounds of coil as shipment 34 (as originally stated in Revision 008).   Revision 010 did not otherwise differ from Revision 009.

20.  Alloys did not acknowledge this document as an agreed upon change of the terms of the contract between the parties.

21.  After the issuance of Revision 009, and again after the issuance of Revision 010, Alloys made multiple unsuccessful attempts to negotiate the agreement to permit Aeronca to reschedule, but not cancel, the shipments as required by Revision 008.

22. Ultimately, Aeronca issued Revision 011 to Purchase Order 729649 on September 29, 2009. Revision 011 indicated that Aeronca would not make any further purchases of contracted goods from Alloys.

23. Because of the substantial lead time involved, Alloys had made several orders to its raw material supplier in anticipation of filling orders described in Revision 008.

24. Prior to the issuance of Revision 009, Aeronca had received 2,150 pounds of the 3,800 pounds originally ordered. 1,650 pounds of material was left to be purchased under Revision 008 when Aeronca issued Revision 009.

25. Aeronca purchased 350 pounds of material after Revision 009 issued, leaving 1,300 pounds of material remaining under the obligations of Revision 008.

26. At the time Revision 009 was issued, Alloys had 548 pounds of finished materials manufactured to specification and ready to ship to Aeronca. Aeronca refused to accept shipment of that material. Alloys was contractually prohibited from selling the product to another buyer. The contract price of the finished material was $205,390.00.

27. On June 15, 2012, Alloys and Aeronca entered into an agreement by which Alloys sold Aeronca the 548 pounds of finished coils for the price of $220,243.79.

28. Excluding the 548 pounds of finished material and the 350 pounds that were purchased, a remaining balance of 752 pounds of material would have been manufactured by Alloys and purchased by Aeronca pursuant to the terms of Revision 008.

29.  The average manufacturing yield loss at the time of Aeronca's issuance of Revision 009 was 27%, meaning that Alloys would have had to purchase 1,030 pounds of raw material to manufacture the 752 pounds to be supplied to Aeronca.[2]

30.  Alloys would have had to pay $146.17 per pound for the raw materials. The raw material cost of the 1,030 pounds would have therefore been $150,555.10.

31.  Alloys would have had to pay a third party vendor $39.45 per pound of finished material in order to complete the production of the contracted goods, meaning that Alloys would have had an additional cost of $29,666 to produce the contracted goods.

32.  Alloys would have also incurred shipping costs of $0.22 per pound, or $165 total, to ship the finished materials.

33.  The total cost to produce the remaining 752 pounds of material would have been $180,386.

34.  The contracted purchase price of the 752 pounds of material would have been $281,850. Subtracting the cost of producing those goods, the profit to Alloys would have been $101,464.

---

[2] The raw material supplier required that Alloys buy material from it in specified minimum quantities. However, there was no evidence introduced at trial indicating where in the buying cycle Alloys was at the relevant times.  Therefore, the Court has no evidence to find Alloys would have had to buy any specified amount of raw material in excess of 1,030 pounds in order to acquire the 1,030 pounds necessary to finish its performance under Revision 008.

35. On March 24, 2010, Alloys issued an invoice to Aeronca for $205,536.57 for the 548 pounds of finished metal ready to ship. The invoice stated " This invoice represents 100% cancellation charges" and indicated that the due date was April 23, 2010. The invoice made no reference to the remaining 752 pounds of unfinished material called for under Revision 008. Aeronca did not pay the invoice.

## II. CONCLUSIONS OF LAW

### A. Terms of the Contract

#### 1. Battle of the Forms

36. A contract between merchants[3] is enforceable if a party receives a written confirmation of the contract sufficient against the sender within a reasonable time, and the recipient does not give notice of its objection to its contents within ten days after it is received. Ohio Rev. Code § 1302.04(B) (2012).

37. The Court finds that Alloys failed to give notice of its objection to Aeronca's Terms and Conditions within ten days of receipt.

38. Accordingly, the original and unmodified Terms and Conditions as proposed by Aeronca are part of the contract between the parties.

#### 2. Requirements Contract

39. Ohio Rev. Code § 1302.19(A) (2012) provides that the buyer may reasonably reduce the quantity of goods purchased if the purchase amount in the contract

---

[3] It is undisputed that the parties are merchants within the meaning of the Ohio Revised Code and the U.C.C.

is determined by a "term which measures the quantity by the output of the seller or the requirements of the buyer."

40. The contract in this case was issued for the purchase of 3,600 pounds of specialty metal coil. There is no evidence in either Purchase Order No. 729649 or Revisions 001 through 008 that Alloys was to supply processed metal only to the extent that Aeronca needed such metals. Rather, the contract refers to a specific quantity of goods at a specific price. Accordingly, the Court finds that Purchase Order No. 729649 and Revisions 001 through 008 were not a requirements contract within the meaning of Ohio Rev. Code § 1302.19(A) and that statute is therefore inapplicable. *See also Arrow Grp. Indus. v. MGD Mfg, LLC*, No. 3:06-cv-304, 2007 WL 3227071, at *7-8 (S.D. Ohio Oct. 29, 2007) (Rose, J.).

### 3. Interpretation of the Contract Terms

41. The purpose of contract construction is to discover and effectuate the intent of the parties, as the contractual language evidences that intent. *Skivolocki v. E. Ohio Gas Co.*, 313 N.E. 2d 374, 375, paragraph one of the syllabus (Ohio 1974).

42. The intent of the parties is presumed to reside in the language they chose to use in their agreement. *Kelly v. Med. Life Ins. Co.*, 509 N.E. 2d 411, 411-412 paragraph one of the syllabus (Ohio 1987).

43. "'[W]here there is doubt or ambiguity in the language of a contract it will be construed strictly against the party who prepared it.'" *Action Grp. Int'l, LLC v. AboutGolf,*

*Ltd.*, No. 3:10-cv-2132, 2011 WL 1627943, at *4 (N.D. Ohio Apr. 29, 2011) (Carr., J.) (quoting *McKay Mach. Co. v. Rodman*, 228 N.E.2d 304, 307 (Ohio 1967); *Graham v. Drydock Coal Co.*, 667 N.E.2d 949, 952 (Ohio 1996) (citing *Cent. Realty Co. v. Clutter*, 406 N.E.2d 515, 517 (Ohio 1980))

44. Paragraph 6 of the Terms and Conditions contains language stating that the Buyer (Aeronca) may "Increase or decrease the quantity of work or services ordered" and "Change work or service schedules."

45. Aeronca argues that "work or services" includes goods such as the specialty metal purchased from Alloys under Purchase Order No. 729649.

46. Alloys argues that "work or services" excludes goods or products.

47. Paragraph 3 of the Terms of Conditions states that "Seller warrants that all Products delivered under the Order will conform to the requirements of the applicable Order . . .," indicating that at least some portions of the Terms and Conditions differentiate between "work and services" and "products" or goods.

48. Given the construction of Paragraph 3, and the fact that the "services" and "goods" have distinctly different meanings within contract law, the Court finds that the reference "work or service" in Paragraph 6 is ambiguous.

49. Because Aeronca drafted the Terms and Conditions without any input from Alloys, the Court construes the ambiguity against Aeronca. Therefore, the Court finds

that Paragraph 6's language permitting Aeronca to "change work or service schedules" does not permit Buyer to unilaterally cancel the quantity of goods ordered.

50. Paragraph 12 of the Terms and Conditions contains language purporting to add extra terms and conditions to the contract pertaining to a so-called unilateral right to "terminate for convenience."

51. As stated *supra*, Paragraph 12 provides for the Buyer's right to "terminate for convenience" in accordance with provisions of the Defense Acquisition Regulations (DAR) and the Federal Acquisition Regulations (FAR). Specifically, Paragraph 12(c) provides that DAR 7-103.11, DAR 8-706, and FAR 19.502(e)(1) are "incorporated by reference in effect on the date hereof."

52. "[A] mere reference to another document is not sufficient to incorporate that other document into a contract." 17A C.J.S. Contracts § 402 (2012). "For the terms of another document to be incorporated by reference into the document executed by the parties, *the reference must be clear and unequivocal*, and must be called to the attention of the other party, he must consent thereto, and the terms of the incorporated document must be known or easily available to the contracting parties." *Rinard v. Eastern Co.,* 978 F.2d 265, 268 n.3 (6th Cir. 1992) (emphasis in original) (citing 17A C.J.S. Contracts, § 299). *See also Kuempel Co. v. Superior Sprinkler Co.*, 1st Dist. No. C-840583, 1986 WL 6202, at *5 (Ohio Ct. App. June 4, 1986) (citing 17A C.J.S. Contracts, § 299 (1963))

("[F]or an effective incorporation by reference, the terms of the incorporated document must be known or easily available to the contracting parties.").

53.  Paragraph 12(b) states that the buyer may terminate the contract "in accordance with the provisions of the termination clause set forth in DAR 8-706" Paragraph 12(c) purports to incorporate DAR 7-103.11 and DAR 8-706 "as in effect on the date hereof," meaning the DAR provisions in effect on February 27, 2008 (the date of Revision 008) and on August 3, 2004 (the date of the initial contract under P.O. 729649). *Credit Agricole Indosuez v. JLH*, No. Civ.A.99-3566, 2000 WL 108930, at *7 (E.D. La. 2000, Jan. 31, 2000) (interpreting "as in effect on the date hereof" to mean "as it existed on the date" incorporated as a contract term).

54.  However, DAR ceased to exist on April 1, 1984 and there were no DAR clauses in effect during the duration of the contract term.  *ATK Thiokol, Inc. v. United States*, 598 F.3d 1329, 1332 n.1 (Fed. Cir. 2010); *see also* 48 Fed. Reg. 42102-01-A, 1983 WL 112419; 1 Gov't Cont. Rept. (CCH) ¶ 250, 2009 WL 4728319 (April 12, 1984).

55. Furthermore, the Court finds no evidence that the incorporating evidence was ever called out to Alloy or that the previously existent DAR provisions were known or easily available to Alloys.

56.  Therefore, because the Court finds that the reference was neither clear nor unequivocal, the incorporating provisions were not specifically called out to Alloys, and the incorporated documents were not made readily available to Alloys, the Court finds

that DAR 7-103.11 and DAR 8-706 were not incorporated by reference and are not part of the contract between the parties.

57. Paragraph 12(b) also provides that the Buyer may terminate the order "in accordance with the provisions of the termination clause as set forth in . . . FAR-19.502(e)(1)." Like the DAR regulations, Paragraph 12(c) attempts to incorporate FAR-19.502.(e)(1) by reference.

58. The Court finds and verifies as a matter of law that "FAR 19.502(e)(1)" does not exist (and FAR 19.502 addresses set aside acquisitions for small businesses, not contract termination).

59. The drafter "should be charged absolutely with knowledge of the language which it incorporated and omitted from [the agreement] as a result of the alleged mistake in drafting." *Lee v. Dayton Power & Light Co.*, 604 F. Supp. 987, 996 (S.D. Ohio 1985) (Rice, J.).

60. The Court finds that there is no basis to grant Aeronca's claim for reformation of the contract to alter Paragraph 12(b) to cite to FAR 49.502(e) because the flaws in Paragraph 12 were entirely and solely the creation of Aeronca, and any ambiguity must be construed against the drafter. Furthermore, there is no factual evidence upon which the Court can conclude that the true, mutual intent of the parties was to cite and incorporate FAR 49.502(e).

61. Accordingly, the Court finds that no FAR provision is a part of the contract between the parties because the purported incorporating reference was never called out to Alloys, there is no evidence that the non-existent FAR provisions were known or easily available to Alloys the reference is neither clear nor unequivocal, and any ambiguity is held against Aeronca as its sole drafter.

62. Because Paragraph 12(c) failed to properly incorporate FAR 49.502(e), DAR 7-103.11, and DAR 8-706, the Court finds that the provisions of Paragraph 12(b) permitting termination for convenience "in accordance with" those provisions is not a part of the operative contract between the parties.

**B.    Breach of the Contract**

63. "[W]hen a contracting party repudiates the contract prior to the time that such party's performance is due, an 'anticipatory breach' or, more precisely, an 'anticipatory repudiation' occurs, and the injured party has an immediate action for damages for total breach. *Farmers Comm. Co. v. Burks*, 719 N.E.2d 980, 990 (1998).

64. Anticipatory repudiation "centers upon an overt communication of intention or an action that renders performance impossible or demonstrates a clear determination not to continue with performance." Ohio Rev. Code § 1302.68 (2012), Comment 1 (UCC § 2-708); *see also Am. Bronze Corp. v. Streamway Prods.*, 456 N.E.2d 1295, 1301 (Ohio Ct. App. 1982).

65. The Court finds that Aeronca committed an anticipatory breach of the contract when it unilaterally issued Revision 009 and cancelled a substantial portion of the quantities required under Purchase Order No. 729649 and Revision 008.

## C.    Waiver

66.  Ohio Rev. Code  1301.06 (2012) provides that "A claim or right arising out of an alleged breach may be discharged in whole or in part without consideration by agreement of the aggrieved party in an authenticated record."[4]  A release of a cause of action for damages "is ordinarily an absolute bar to a later action on any claim encompassed within the release." *Haller v. Borror Corp.*, 552. N.E.2d 207, 210(Ohio 1990).

67.  The interpretation of the effect of a release is based upon the intention of the parties to the instrument. *Zenith Radio Corp. v. Hazeltine Research, Inc.*, 401 U.S. 321, 346-48,(1971); *Whitt v. Hutchison*, 330 N.E.2d 678, 682 (Ohio 1975).

68.  "An agreement between a plaintiff and a defendant that the plaintiff will compromise a claim for relief and release a defendant from liability upon the defendant's payment of an amount of money is a contract, and like all contracts, requires a meeting of the minds in order to be binding on the parties." *Garrison v. Daytonian Hotel*,663 N.E.2d 1316, 1317 (Ohio Ct. App. 1995).

---

[4] This section recently replaced Ohio Rev. Code § 1301.07, which stated: "any claim or right arising out of an alleged breach can be discharged in whole or in part without consideration by a written waiver or renunciation signed and delivered by the aggrieved party."

69. The Court finds that Marvin Rubman's statement that "once the above issue has been resolved, we can work on a reschedule for the balance of the material required" is insufficient to establish a true waiver. The statement merely states that the parties can work out a resolution of the remaining claims; it does not unequivocally waive said claims.

70. The Court also finds that the March 2010 invoice for the finished materials, which states that it represents "100% cancellation charges" is not an unequivocal waiver of claims for lost profits on unfinished materials. Alloys sent an invoice for its finished materials, and Aeronca has presented no evidence that the invoice was also meant to cover any costs for unfinished materials.

71. Accordingly, the Court concludes that there is insufficient evidence to establish that there was a meeting of the minds regarding a waiver of any claim surrounding lost profit damages.

**D.    Damages**

72 .  Alloys is entitled to recover as damages the amount by which the unpaid contract price of the goods exceeds the market price at the time of the breach. From this amount subtract any expenses saved by Alloys as a result of Aeronca's breach. Ohio Rev. Code § 1302.82(A) (2012).

73. . At the time Revision 009 was issued, Alloys had 548 pounds of finished materials manufactured to specification and ready to ship to Aeronca at a purchase price of $205.390. Because Alloys was contractually prohibited from selling the product to another buyer, the market price was $0.

74. Alloys was therefore entitled to $205,390 in damages for the finished metals, the legal right to which accrued when Aeronca repudiated the shipment on December 8, 2008.

75. Alloys mitigated its damages when it sold the finished materials to Aeronca on June 15, 2012.

76. Alloys is entitled to prejudgment interest on the finished coils, accruing from December 8, 2008 through June 15, 2012. *Royal Electric Constr. Corp. v. Ohio State Univ.*, 73 Ohio St.3d 110, 652 N.E.2d 687 (1995); Ohio Rev. Code §1343.03.

77. Interest shall be computed at the rate per annum determined pursuant to Ohio Rev. Code §§ 1343.03(A) and 5703.47.

78. Therefore, Alloys is entitled to judgment as to the finished coils in the amount as follows: $205,390 in contract damages, plus pre-judgment interest, less $220,243.79 in the purchase price paid by Aeronca on June 15, 2012.

79. Alloys is entitled to recover damages for the unfinished coils in the amount of lost profits it would have received had the contract been completed. Ohio Rev. Code § 1302.82(B).

80. A remaining balance of 752 pounds of material would have been manufactured by Alloys and purchased by Aeronca pursuant to the terms of Revision 008.

81. As described *supra*, the total cost to produce the remaining 752 pounds of material would have been $180,386.

82. The contracted purchase price of the 752 pounds of material would have been $281,850. Subtracting the cost of producing those goods, the profit to Alloys would have been $101,464.

83. The Court finds that Alloys is entitled to judgment consisting, in part, of $101,464 in lost profit damages, the legal right to which accrued as of the date of the breach, December 8, 2008.

84. The Court finds that Aeronca has not proven any failure to mitigate damages that might offset any portion of Alloys' recovery.

85. Alloys is entitled to prejudgment interest computed at the rate per annum determined pursuant to Ohio Rev. Code §§ 1343.03(A) and 5703.47, calculated from December 8, 2008 through the date of this order.

**F.    Attorneys' Fees and Costs**

86. Paragraph 29 of the Terms and Conditions provides that in the event of litigation between the parties, the prevailing party shall be awarded attorneys' fees. The parties have stipulated that they shall address issues arising out of this provision after the Court's decision on the merits.

## III. CONCLUSION

Accordingly, for the reasons stated here, the Court finds and concludes:

(1)      Aeronca's original Terms and Conditions, unmodified by Alloys, formed part of the contract between the parties;

(2)      Paragraph 6 of the Terms and Conditions did not permit Aeronca to unilaterally cancel or reduce the quantity of material ordered under the contract;

(3)      Paragraph 12 did not properly incorporate provisions of the DAR and FAR by reference;

(4)      Paragraph 12 does not permit Aeronca to terminate the contract for convenience;

(5)      Defendants' claim for reformation of Paragraph 12 of the Terms and Conditions is denied;

(6)      Alloys did not provide a clear and unequivocal waiver of its claim for lost profits;

(7)      Alloys is entitled to damages in the following amounts:

          (a)      $205,390.00 in contract price damages for the finished materials, plus prejudgment interest accruing from December 8, 2008 through June 15, 2012, minus $220,243.79.

          (b)      $101,464 in lost profits for the unfinished material;

          (c)      Prejudgment interest, accruing from December 8, 2008 to the date of this order on the $101,464 in lost profits;

(8)      As previously determined by the Court, interest shall accrue at the statutory rate as provided in Ohio Rev. Code § 1343.03 (2012); and

(9)      Plaintiff shall file its motion for attorneys' fees and costs within twenty-one (21) days from the date of this order.

**IT IS SO ORDERED.**

Date:  8/21/12                    _s/ Timothy S. Black_
                                 Timothy S. Black
                                 United States District Judge